A96A1377. GRIFFITHS v. SCHAFER et al.
(478 SE2d 625)

BIRDSONG, Presiding Judge.

Kerry Schafer, a veterinary technician, sued Arthur Griffiths, the owner of an Akita dog who attacked Schafer while she was attempting to place a collar around him. The trial court denied the dog owner's motion for summary judgment, and he appeals. *Held*:

In *Lundy v. Stuhr*, 185 Ga. App. 72, 73 (363 SE2d 343), this Court held that a kennel attendant assumed a known risk that a dog "might bite" and thus assumed the risk of a dog bite when opening the animal's cage to retrieve his water bowl. In that case, a sign was placed outside the cage door with stickers stating the dog "doesn't like girls," was an "escape artist" and "will bite." Lundy, a male, was

assigned to attend that dog and had done so for several days before he was severely bitten. He testified he had been taught how to act in a "fluid" way so as not to provoke tendentious dogs. While reaching for the dog's water bowl, Lundy saw the dog coming toward him but apparently took no protective action and continued to reach for the water bowl. When the dog arrived near Lundy, Lundy stood up and put his left arm up, and the dog attacked, inflicting numerous severe bite wounds.

The question we addressed in that case was whether Lundy assumed the risk of a dog bite, "thus eliminat[ing] any issue of liability in the Stuhrs for exposing Lundy to a 'vicious' dog." Id. at 73. We held: "It is in the common knowledge of the members of society that even domestic animals, when startled, are prone to defend themselves by biting. It is an unwise person who approaches an unknown dog and makes gestures toward that dog without first ascertaining the propensities of the dog. That such is common knowledge is manifested in this record by Lundy's concession that he is aware that all dogs, large or small, may bite. It was for this reason that he received special training how to handle dogs and how especially to handle large dogs because of their ability to inflict serious injury." Id. at 73-74. We affirmed the summary judgment to the dog owner in *Lundy*, on the basis of the general doctrine of assumption of risk by workers in certain professions: to wit, that ordinarily there is no duty to give warning to the members of a profession against generally known risks in that profession, and there need be no warning to one in a particular trade or profession against a danger generally known to that trade or profession. We concluded that Lundy was well aware this dog could attempt to escape from his cage, and "[w]hile Lundy sought to limit the implication that the dog would bite females, the sign prominently displayed on the exterior of the cage simply stated the dog 'Will bite.' " Id. at 74. This logically "would require Lundy to exercise special caution" with this dog, but when Lundy saw the dog moving toward him, he did not speak soothingly or withdraw but ignored the moving dog until it was at the door, and then Lundy suddenly stood up and raised his left arm. We held that Lundy went into the situation with his eyes wide open; that he saw the whole picture and had the opportunity to measure the risk; and that he *was under no compulsion to enter the cage and thereafter ignore the movement of the dog*. In *Lundy*, "the veterinarian voluntarily entered into a contract for care of the Stuhrs' dog, with full knowledge of the risk, and informed his employee via the posting of signs on the dog's run. *Knowledge of the danger was apparent and the veterinarian and his assistant acquiesced in it by undertaking care of the dog*." (Emphasis supplied.) Id. at 75.

The plaintiff in this case makes strong attempts to distinguish

the facts in this case from those in *Lundy*. She admits she had worked for eight years as a dog handler in six different veterinary clinics, had specifically dealt with Akita dogs in the past, and knew they were aggressive and unpredictable. She had personally seen this dog's aggressive behavior, and she knew Akitas could be violent or aggressive, as she had "seen it in the breed" before this incident. She knew this dog had a tendency to "get a little out of hand" and that he "became agitated and started growling and showing his teeth and [jumped off the table]" while the staff attempted to give him shots in the past. During that earlier incident, the dog went to a corner "and wouldn't let any of [the attendants] get near him," and if anyone approached the dog, he growled and acted as if he were going to bite. Despite her knowledge of these facts, however, she contends there are issues of fact whether there was a notation on the dog's chart that he "may bite," even though the veterinarian himself testified there was such a notation highlighted in pink. She also contends there is a big difference between a notation that a dog "may bite" and that he "will bite," as was the case in *Lundy*.

We fail to discern a dispositive distinction between a notation that a dog "may" bite or that he "will" bite, such that in the latter case a veterinary attendant handling such dog may assume the risk of being bitten while in the former case she may not assume the risk. The risk of being bitten, if it exists at all, must be assumed by the handler to be potentially the same in both instances. With specific knowledge of the aggressive propensities of this particular breed of dog, and of this particular dog, Schafer voluntarily attempted to place a collar on him. Assumption of the risk in certain professions refers to the risk that the situation is potentially dangerous; it is not necessary to the assumption of the risk that she acted negligently, as Lundy perhaps did in his sudden movement in the *Lundy* case. Assumption of the risk is a matter of knowledge of the danger and intelligent acquiescence in it. Id. at 75. We find it significant that, as in *Lundy*, the veterinarian voluntarily entered into a contract for the care of Griffiths' dog with full knowledge of the Akita breed's violent and aggressive potential. So did the attendant. As we said in *Lundy*, every adult is presumed to be endowed with normal faculties, both mental and physical. Id. at 74. No evidence has been presented to us that Schafer was compelled or forced to do this work or to put a collar on this particular dog, beyond her ability and prerogative as an adult to refuse.

It is significant to this decision that the care of dogs necessarily involves, as said Judge Deen in his dissent in *Lundy*, both good dogs and bad dogs. Schafer assumed the risk of dealing with this "bad dog" beyond any genuine issue of material fact.

We specifically note that we do not in this case establish that

there is an immutable, absolute assumption of risk by veterinary employees in handling animals. The provisions of OCGA § 4-8-30 that "the owner of a dangerous dog or potentially dangerous dog shall be solely liable for any injury to or death of a person caused by such dog" does not impose absolute liability on the owner of a dog who has bitten before. OCGA § 4-8-30 means that *if* any person is liable for such bite, it is the owner, and not a government official. Each case depends on its facts. In general, veterinary employees know that practically any dog will bite in certain circumstances and that particularly violent and aggressive breeds are more likely to bite and even to inflict severe wounds. Such employees are either trained to handle such cases, or being adults, may leave them alone. But there may come a case where, for example, veterinary employees have never dealt with a particular dog and are actively misled by an owner about its tendencies, or there may be a case involving a "demon dog" (see *Lundy*, dissent) whose propensities for violence extend far beyond any risk such employees may ever be deemed to assume in their employment. This is not such a case. Accordingly, we find the trial court erred in denying summary judgment to the defendant dog owner in this case.

*Judgment reversed. Pope, P. J., Andrews, Johnson, Blackburn, Smith and Ruffin, JJ., concur. Beasley, C. J., and McMurray, P. J., dissent.*

BEASLEY, Chief Judge, dissenting.

The trial court's denial of summary judgment should be affirmed in this case in which a caretaker was severely injured by the dog which was being boarded at a veterinary clinic.

The majority concludes that the undisputed facts show that the injured plaintiff assumed the risk of injury from a dog bite and thus cannot prevail in her suit alleging that the dog owner failed to warn plaintiff of the dog's violent nature and potential danger to persons with whom the dog came into contact.

" 'The defense of assumption of the risk presupposes (1) that the plaintiff had some actual knowledge of the danger; (2) that he understood and appreciated the risk therefrom[;] and (3) that he voluntarily exposed himself to such risk.' [Cit.]" *Abee v. Stone Mountain Mem. Assn.*, 169 Ga. App. 167, 169 (1) (312 SE2d 142) (1983), aff'd, 252 Ga. 465 (314 SE2d 444) (1984).

"The denial of a motion for summary judgment must be affirmed unless the entire record, construed against the movant, [defendant in this case, plaintiff in the quoted case,] reveals no disputed issues of material fact and demonstrates that the movant is entitled to judgment as a matter of law." *Bartja v. Nat. Union Fire Ins. Co. &c.*, 218 Ga. App. 815, 816 (463 SE2d 358) (1995).

"A person who owns . . . a vicious or dangerous animal of any kind and who, by careless management . . ., causes injury to another person who does not provoke the injury by his own act may be liable in damages to the person so injured." OCGA § 51-2-7.

Kerry Schafer, plaintiff, alleged in her complaint that dog owner Griffiths knew, or should have known, that his dog was violent and potentially dangerous to persons with whom the dog came into contact and that he failed to warn her of the danger. There is evidence that Griffiths knew the dog was dangerous and that he had observed the dog actually bite a dog groomer on the arm six months earlier at a pet center.

There is no evidence that, after the first bite, Griffiths took the steps required for a "potentially dangerous dog" in the Dangerous Dog Control Law. OCGA § 4-8-20 et seq. See OCGA § 4-8-21 (a) (6). The intent of the General Assembly in passing the Act is to provide "that the owner of a dangerous dog or potentially dangerous dog shall be solely liable for any injury to or death of a person caused by such dog." OCGA § 4-8-30.

There is a dispute of fact about whether there was any notation on the dog's chart where Schafer worked that the dog "may bite," but there was no notation that he was dangerous. Plaintiff testified the notation was put on the chart *after* the incident, by the veterinarian. The veterinarian testified that it was probably put on by one of the receptionists, when Griffiths first brought the dog to be boarded. If it was not there at the time of this incident, whether prompted by the dog owner or originated by an employee of the clinic, then plaintiff was not warned by it.

Thus, whether failure to warn would be "careless management" by the dog owner under the circumstances is a jury question. The failure to warn would also affect the defense of assumption of the risk by plaintiff, because such a defense presupposes actual knowledge of the danger. *Abee v. Stone Mountain Mem. Assn.*, supra.

There is another issue of fact about notice, or knowledge of the danger. In an earlier incident at the clinic, when the staff tried to give the dog vaccine shots, he became agitated and started growling and showing his teeth and jumped off the table, went into a corner, and growled and acted as though he would bite if anyone approached. So they left him alone in the corner until he calmed down, and then the veterinarian put him back in the cage. Plaintiff knew he would show signs of aggression if someone tried to remove his food bowl if there was any food left in it when he stopped after initially eating. But she had taken him out of the cage before this incident at issue, without problem. Relevant to this instant occasion, his collar had been taken off so he could be given a bath and his collar could be cleaned. Plaintiff went in order to help an employee who was not feeling

well, a pregnant woman who held an inferior position as a "kennel assistant" (plaintiff was a "vet tech"). The woman had been asked to affix the collar by the veterinarian so the dog would be ready to go home when his owner came after boarding him.

When Schafer went to the back to put the collar on the dog, she opened the big stainless steel dog run where the dog was by himself. The dog jumped out down to the floor and wagged his tail, looking friendly. She told him to stay still, and she stood to the right of his hindquarters. She put her hand on his back and said "stay" and reached the collar around him over his back. In the process he turned around and bit the right side of her face. This all happened within seconds. When she tried to leave, he came after her; she fell, and he bit her at least twice more and was dragging her back into the kennel when help came in the form of Dr. Morgan, the veterinarian, with a broom or mop handle.

Did all of what plaintiff knew, before she attempted the chore, as a matter of law give her actual knowledge, understood and appreciated, that the dog might bite her if she tried to put his collar on? There is no question that the previous incidents of aggression were different. The dog was being subjected to shots in the one instance and to having his food taken away in the other instances. Here he was having his collar, which was usually left on, put back, and he came to plaintiff and acted friendly in the process, up until he suddenly turned his head and bit her. It is a jury question whether she acted reasonably or whether, on the other hand, she assumed the risk of being bitten so that she is precluded from recovery by her own actions as an injured party.

The majority depends entirely on the whole court case of *Lundy v. Stuhr*, 185 Ga. App. 72 (363 SE2d 343) (1987), in which three judges dissented including this writer. The majority opinion in this instance is authored by the author of the *Lundy* opinion. There are differences of fact which make this case stronger for the plaintiff, and as the majority states, "Each case depends on its facts." The law does not impose the defense of assumption of risk in all circumstances on every member of the profession who provides care to domestic animals. Here, accepting plaintiff's evidence, there were no signs or other written warnings about a propensity to bite or knowledge that the dog had the unpredictable disposition, as in *Lundy*. Also, Lundy did not heed the dog's approach or calm it but instead moved suddenly and raised his arm. These actions were held to constitute assumption of the risk of injury as a matter of law. Plaintiff Schafer's knowledge and actions are not comparable.

Plaintiff was merely readying the dog for home in a non-threatening and calm way, without any hint that he was about to become aggressive. She was not repeating any threatening actions

which on earlier occasions had riled him. In fact, he exhibited the opposite on this occasion. The majority is saying, in effect, that she should have refused to put the collar on or should have taken some other unspecified steps before she attempted to put the collar on or should have refused altogether, absent which she assumed the risk of injury as a matter of law.

I am authorized to state that Presiding Judge McMurray joins in this dissent.

DECIDED NOVEMBER 15, 1996 — ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

*Downey & Cleveland, Y. Kevin Williams, Richard A. Griggs*, for appellant.

*Douglas J. Davis, James D. Nichols, Jr., Robert H. Speer, Jr.*, for appellees.